## LLOYD ALLEN BLACKWELL v. STATE.

No. A-10549.   July 17, 1946.

(171 P. 2d 634.)

Foy Edwards, of Shawnee, and Sam J. Goodwin, of Pauls Valley, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Ewing C. Sadler, Asst. Atty. Gen., and Claude Hendon, Co. Atty., of Shawnee, for defendant in error.

JONES, P. J.   The defendant, Lloyd Allen Blackwell, was charged by information filed in the county court of Pottawatomie county with the offense of willfully omitting without lawful excuse to furnish necessary food, clothing, shelter and medical attention for his minor children;   was tried, convicted and sentenced to serve twelve months in the county jail and pay a fine of $500, and has appealed.

The defendant, Lloyd Allen Blackwell, and his wife, Helen Louise Blackwell, were married in 1930, and of this marriage three children were born prior to the separation of the parties in October, 1942, and another child was born in the month of December, 1942, about two months after the separation of defendant and his wife.

In the year of 1942 the defendant and his family were living at Wayne in McClain county, Okla. In the summer of 1942 the defendant began operating a small garage where he did mechanical work.

Helen Louise Blackwell testified that on October 7, 1942, the defendant left her and the minor children at their home in Wayne and said he was going to his dad's, who lived in that vicinity; that he left her only $20 to buy clothes for their expected child, which he later returned and took from her. That for many days before he left their home he would change his clothes at the end of his day's work and leave their home and stay out all night. That when defendant permanently left their home, he packed his clothes and said, "You can go or stay where you please." That they then owed $46 at the grocery store and their credit was cut off; that she was forced to appeal to her father for help, and her folks then moved her to Wanette. That the moving was paid for by her brother, and her brother and her folks had paid her expenses and provided her and the children with the necessities of life since that date, with the exception of certain things provided for them by the Public Welfare Department. That after defendant had been gone a few weeks, defendant's father came to see her and offered her $20, but she refused to accept it because it came from him and not from the defendant, and defendant's father at that time refused to tell her where defendant was living; that she has lived continuously in Wanette in Pottawatomie county with her children, since moving from Wayne, and was never served with any process for a divorce by defendant.

Wyman Blackwell, eleven year old son of defendant, testified that defendant had been gone from home about

four days before they moved to Wanette; that his mother begged the defendant to stay and support them when defendant left. That the defendant stayed away from home "most every night" before he left; that the defendant bought him a pair of boots a few days before leaving and told him at that time it would be the last pair he would get. That his father had not furnished him and the other children with any food or clothing since he left.

Other witnesses testified on behalf of the state, corroborating the evidence of Mrs. Blackwell and the eleven year old son of defendant.

The defendant testified in his own behalf that because of business conditions at Wayne he had discussed with his wife about moving to California, but that she refused to go. That he had grocery bills and other indebtedness to meet which he could not pay, and that he thought if he could go to California he could secure work to take care of his family and pay his indebtedness; that he made no preparations to move to California until after his wife's folks had come and moved her out of his home; that he did not know whether his wife had moved to Norman or Wanette; that after he had gone to California he sent his father $20 out of his first pay check to be paid to his family; that he sent his father $20 more before he heard from his father about his wife refusing to accept the first money. That later he instituted divorce proceedings in Garvin county and got service on his wife by publication. That the next day after the divorce was granted to him, he was married in Texas.

There was considerable other evidence, both on the part of the state and the defendant, which will be hereinafter discussed, as relates to one of the issues raised that

the defendant had been denied a fair trial because of the admission of incompetent and irrelevant testimony which was prejudicial to defendant.

The first assignment of error is that the court erred in overruling defendant's motion to dismiss and his demurrer to the evidence for the reason that the county court of Pottawatomie county did not have jurisdiction of the offense charged against the defendant for the reason that the venue of any offense that was committed was in McClain county, Okla., where the separation of the defendant and his family occurred.

The defendant bases his argument in support of this proposition that the wife by her voluntary act had moved from the family home provided for her by defendant and had taken her children to another county where the defendant had never been.

This prosecution charged an offense under the terms of the statute which makes it a misdemeanor to wilfully omit without lawful excuse to perform any duty imposed upon a parent by law to furnish necessary food, clothing, shelter and medical attendance for a child. 21 O.S. 1941 § 852.

There is a distinction to be drawn between a prosecution under this statute and one for desertion of the wife or children under the provisions of 21 O.S. 1941 § 851 and § 853.

It has been held that the duty of the parent to support the offspring is a continuing obligation, and is properly tried for the offense in the county where the children became dependent regardless of the residence of the father. Allred v. State, 28 Okla. Cr. 13, 228 P. 788;

Dean v. State, 55 Okla. Cr. 356, 30 P.2d 195; Dyer v. State, 58 Okla. Cr. 317, 52 P.2d 1080.

In Allred v. State, supra [28 Okla. Cr. 13, 228 P. 789], it is stated:

"This is a statute providing relief and punishment for the omission of a duty, as distinguished from punishment for the commission of an illegal act. The venue of the action would therefore appear to be in the county in which the failure to do the duty occurred; i.e., the failure to provide for the children."

In Dyer v. State this court stated in the body of the opinion [58 Okla. Cr. 317, 52 P.2d 1082]:

"The obligation of parents to support their offspring rests upon an entirely different foundation from that upon which the law bases the duty of the husband to support his wife. That obligation is at once legal and natural. It springs as necessarily from the law as from the primal instincts of human nature. Its consistent enforcement is equally essential to the well-being of the state, the morals of the community, and the development of the individual. Prolonged childhood is a condition of civilization as well as a product of conscience. The child, helpless in extreme infancy and required in the maturer years of its minority to obey the reciprocal duty of serving its parents, is not to be deprived of its natural and legal right of protection and support by its father, because of any family quarrel or of any agreement between husband and wife."

The authorities relied upon by counsel for defendant were from other jurisdictions and were cases involving desertion of wife or children, and were most all based on the fact that the wife had left the home which the husband had provided for her without good cause, while the husband continued to live in the home, but regardless of the decision in other states, in the case of Allred v. State,

supra, this court has specifically passed upon the question raised by defendant contrary to his contention.

The remaining assignments of error may be considered together. They are as follows:

1. Misconduct on the part of the county attorney objected to by defendant at the time.

2. The admission of incompetent and irrelevant evidence over objection of defendant, which prejudiced his rights.

3. Excessive punishment allegedly given under the influence of passion and prejudice.

In the opening statement of the county attorney, among other things, he stated that the proof would show that the defendant had been going with a girl in Pauls Valley who worked in a beer tavern. That the defendant and the girl known as Ozie Baggett left Pauls Valley together and went through Arizona and on to California; that in October, 1943, he returned to Pauls Valley, filed a petition for divorce against his wife, made a false affidavit that he did not know of her whereabouts and secured service by publication. That on December 6, 1943, he obtained a divorce from his wife and took Ozie Baggett to Montague county, Tex., where he was married to her on December 7, 1943.

Counsel for defendant made repeated objections during the opening statements of the county attorney with reference to the defendant's alleged association with Ozie Baggett, and at the conclusion of the statement of the county attorney, the defendant, through his counsel, moved for a new trial because of the prejudicial and inflammatory statement of the county attorney, which mo-

tion was overruled. In the cross-examination of the defendant, the defendant was subjected to a vigorous cross-examination. Many questions were asked and answered over the objection of counsel for defendant. Some of these questions which counsel for defendant argue were prejudicial are as follows:

"Q. When did you meet your present wife? A. I had seen her a few times along about July, 1942. Q. That was before you and your wife broke up? A. I had seen her at that time. Q. You knew her at Pauls Valley where she worked? A. No. Q. Are you acquainted with a man in Pauls Valley by the name of Dewey Dixon? A. Yes. Q. He runs a beer place and restaurant down on Dirty street in Pauls Valley, is that right? A. I don't know. Q. You know where his place of business is? A. Yes. Q. You know he has been there a long time? A. Yes. Q. You knew your wife when she worked for Dewey? A. I had seen her there, yes. Q. And you met her in the summer of 1942? A. No. Q. What was your last wife's name before you married her? A. Ozie Baggett. Q. What was her maiden name? A. Ozie Norman. Q. Did you know Ozie Baggett on or about the 1st day of September, 1942, you said you met her in the summer? A. I knew of her, yes. Q. You had met her and had been with her? A. I did not say I had been with her. Q. You remember when you got your shirt sleeve torn off, did you get it really torn off? A. No. Q. You heard your wife's testimony about you coming in a few weeks before you left after being out all night, with your shirt sleeve torn? A. I did not come in with my sleeve torn. Q. She testified that you had been in a fight? A. I had not. Q. She testified that a few weeks before the 7th of October, 1942, that you came and got $20 that she had for baby clothes, and on your testimony you said you got it to buy parts? A Yes, sir, Q That was on the 1st of September? A. No it was along about the 1st of October. Q. To refresh your memory, I will ask you if you did not get the $20 and take it to Pauls Valley shortly after the

first day of September and pay a $7.50 police fine for Ozie Baggett, under the pains and penalty of perjury, I want you to tell that? Did you take that $20 and out of that pay her police fine in Pauls Valley? A. Not out of that $20. Q. What did you pay it out of? A. I loaned her the money to pay the fine. Q. You were not going with her then? A. No. Q. How did you get in touch with her to loan her the money? A. Her sister asked me for it. Q. Did you know she was in jail? A. Yes. Q. Did you know she had been in jail several days? A. No. Q. Where were you when her sister came to you? A. I was in town. Q. What time of day? A. It was one night. Q. Was that the night you got your shirt sleeve torn off? A. No. Q. You got into a fight over a woman? A. I did not. Q. So you really loaned her sister the money? A. Yes, sir. Q. Now, you do know that while she was working for Dewey Dixon or at the beer parlor at Pauls Valley that you had been keeping company with her during that time? Now, you went to California with Ozie Baggett when you left your family? A. No. Q. You left by way of Arizona? A. Yes. Q. You stopped in Phoenix, did you not? A. No. Q. How did you go? A. Travel Bureau. Q. You mean Ozie Baggett was not with you in Phoenix, she was on the travel bureau? A. Yes. Q. Was she in the same car? A. Yes. Q. Were you present with Ozie Baggett when she wrote a card back to Dewey Dixon where she worked in Pauls Valley, where she said that she and Lloyd had been held up in Arizona? A. No. Q. You know that Jim Norman was the one who had the F. B. I. after you and caused you to be questioned through the F. B. I. authorities about having transported Ozie Baggett from Pauls Valley to California, and they asked you about that? A. No. Q. You know Jim Norman is the fellow who did it? A. No. Q. Did you learn it was? A. No. Q. When the F. B. I. questioned you, did they show you a copy of a letter that the county attorney wrote them to ascertain your address? A. No. Q. They did not show you that letter? A. No. Q. You obtained your 3-A draft deferment on the theory that you were supporting your children, is that right? A. Yes.

Q. That was your draft status when you went to California? A. Yes. Q. Have you got your papers on you? A. Yes."

There were many other qeustions asked the defendant along the same line as indicated by the above testimony, and, in addition, the defendant was questioned at length about the procurement of the divorce from his former wife. Objections were repeatedly made by counsel for defendant during this interrogation, but were overruled with exceptions allowed to defendant.

In the case of Washington v. State, 22 Okla. Cr. 69, 209 P. 967, 969, this court reversed a conviction in the county court of Texas county because of admission of evidence that defendant had attempted to criminally assault one of his children and had been cruel to his wife by whipping her. The prosecution in that case was under the statute herein involved for wilfully failing to provide necessary food and clothing for his minor children. In the opinion it is said:

"It is not our purpose to condone the action and conduct of defendant toward his wife and children. If the testimony of some of his children is true, he was very cruel both to his wife and to them, but that was not the issue in this case. Those were not the offenses for which defendant was being tried. If the officers had been in possession of evidence sufficient to convict of such offenses defendant should have been prosecuted therefor, and evidence of such offenses should not have been injected into a prosecution for willfully omitting to furnish necessary food and clothing for his children."

In the recent case of Hill v. State, 81 Okla. Cr. 342, 165 P.2d 146, it is held:

"A defendant in a criminal case is entitled to fair treatment in his trial and prosecuting attorney should

not be permitted to ask questions which he knows to be illegal for the purpose of prejudicing the defendant in the eyes of the jury."

In this connection see, also, the cases of Watson v. State, 7 Okla. Cr. 590, 124 P. 1101; Rogers v. State, 8 Okla. Cr. 226, 127 P. 365; Corliss v. State, 12 Okla. Cr. 526, 159 P. 1015.

It is evident that a great deal of the evidence brought out on cross-examination of the defendant was wholly irrelevant to the issue as to whether the defendant had wilfully omitted to provide the necessities of life for these minor children The jury, after hearing the evidence above quoted, might be confused as to whether they were trying the defendant for draft evasion, for violation of the Mann Act, 18 U.S.C.A. § 397 et seq., for committing perjury in connection with the testimony in a divorce action, for vagrancy, adultery, or any other of several crimes which the county attorney contended the defendant had committed from the time of his separation from his family to the time of trial.

We are not impressed with the story related by the defendant as to the reason why he had not contributed to the support of his minor children. By his own admission, the defendant for a period of two years had not made any effort to ascertain the whereabouts of his minor children. His wife had borne him a child after his separation, and he had made no inquiry about this youngster's welfare or whether the child was a boy or girl.

If this were a close case where the question of guilt or innocence of the accused was strongly disputed, the admission of the evidence hereinbefore discussed would have been grounds for a reversal of the conviction. Here,

however, the guilt is apparent. This man could be tried over and over again for this offense before a jury who had any regard for their oath as jurors and the result would always be the same. However, since the court did err in admitting this incompetent testimony which certainly was harmful to defendant, we feel that the defendant is entitled to some relief because of this error.

In Hill v. State, supra, we held that where the guilt of the defendant is clear, the admission of prejudicial testimony on cross-examination of defendant will require this court to modify the sentence which was imposed in accordance with the jury's verdict.

In the instant case, the maximum punishment of one year in the county jail and $500 fine was imposed. Because of the admission of the incompetent evidence, it is our opinion that the judgment and sentence should be modified from one year in the county jail and a fine of $500 to six months in the county jail and a fine of $200.

It is therefore ordered that the judgment and sentence of the county court of Pottawatomie county be reduced from one year in the county jail and a fine of $500 to six months in the county jail and a fine of $200, and the judgment and sentence of the county court of Pottawatomie county as thus modified is affirmed.

BAREFOOT, J., concurs. DOYLE, J., not participating.